**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TONYA BELL, | ) | CASE NO. 1:19cv1368 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Tonya Bell ("Plaintiff" or "Bell"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381

*et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the

parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final

decision is AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

On January 27, 2017, Bell filed an application for SSI alleging a disability onset date of November 1, 2015, and claiming she was disabled due to depression, sciatica and lumbar degenerative disease. (Transcript ("Tr.") at 128, 150.) The application was denied initially and upon reconsideration, and Bell requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 76-78, 86-90, 91-93.)

On July 12, 2018, an ALJ held a hearing, during which Bell, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.* at 29-46.) On October 31, 2018, the ALJ issued a written decision finding Bell was not disabled. (*Id.* at 15-24.) The ALJ's decision became final on May 3, 2019, when the Appeals Council declined further review. (*Id.* at 1-6.)

On June 13, 2019, Bell filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 15.) Bell asserts the following assignments of error:

(1)  Whether the ALJ erred in weighing the opinion of Plaintiff's treating nurse practitioner when he concluded the plaintiff had the residual functional capacity to perform light work.

(2)  Whether the ALJ erred in not finding that Plaintiff's mental impairments were severe, or, in the alternative, by failing to address Plaintiff's mental impairments in the residual functional capacity determination.

(Doc. No. 13 at 1.)

# II.  EVIDENCE

## A.  Personal and Vocational Evidence

Bell was born in April 1965 and was 51 years old at the time her application was filed, making her an individual closely approaching advanced age under Social Security regulations. (Tr.

23.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has at least a high school education[2] and is able to communicate in English.  (*Id.*)  She has no past relevant work.  (*Id.*)

## B.    Relevant Medical Evidence[3]

### 1.    Mental Impairments

On April 5, 2017, Bell sought mental healthcare at Connections Health and Wellness Center ("Connections").  (*Id.* at 531.)  She told the assessor, Desiree Paschal, LPCC,  that she had been sober for four months.  (*Id.*)  She reported a history of trauma including rape and witnessing murder due to her prior drug use.  (*Id.* at 535.)  Ms. Paschal diagnosed her with Persistent Depressive Disorder, Post-traumatic Stress Disorder, Panic Disorder, and Severe Cocaine and Alcohol Use Disorder in early remission.  (*Id.* at 540.)  She recommended a psychiatric evaluation, individual counseling, alcohol and other drug treatment counseling and outpatient therapy.  (*Id.* at 541.)

On April 22, 2017, Nurse Barbara Wiseley-Cortland performed a psychiatric evaluation of Bell at Connections.  (*Id.* at 543.)  She noted that Bell had a anxious and depressed mood, average or below average intellect, and "fair" insight and judgment.  (*Id.* at 544.)  Her diagnosis was unchanged, and Nurse Wiseley-Cortland prescribed Wellbutrin.  (*Id.* at 546.)

In April and May, 2017, Bell attended three sessions of individual counseling at Connections, but this was terminated based on Bell's decision that she "does not need or want counseling."  (*Id.*

---

[2]  The record shows that Bell dropped out of high school in tenth grade when she became pregnant.  (Tr. 342.)  Although she described her high school grades as "Cs," a report card from Shaw High School in the Cleveland Public School District show she was failing several core subjects in her freshman year, including biology and reading.  (*Id.* at 342; 335-36.)  However, she does not challenge the Commissioner's description of her education level, so the Court will not address it here.

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

at 833-37.)

On May 24, 2017, Bell returned to Connections for medication management. (*Id*. at 838.) Bell reported that the medications were effective in the evening, but that she was waking around four in the morning. (*Id*.) Nurse Wiseley-Cortland prescribed Trazadone to treat Bell's insomnia. (*Id*.)

At Bell's July 10, 2017 medication management appointment, Nurse Wiseley-Cortland added Lexapro to treat Bell's depression and anxiety. (*Id*. at 841.)

At Bell's August 10, 2017 medication management appointment, Nurse Wiseley-Cortland noted Bell still reported nightmares, and was sleeping five to seven hours a night. (*Id*. at 972.) She did not adjust her medications. (*Id*.)

Also on August 10, 2017, Bell began seeing Damien Montassi at Connections for community psychiatric support treatment ("CPST"). (*Id*. at 934.) He noted she was "appropriate in all areas of behavior except has nightmares and trouble sleeping." (*Id*.)

At Bell's December 14, 2017 medication management appointment, Nurse Wiseley-Cortland noted Bell was now sleeping well, but reported confusion between dreaming and waking states: "when I wake up, its like my dreams become real." (*Id*. at 985.) Nurse Wiseley-Cortland decreased Bell's dosage of Trazadone and tapered her off Lexapro. (*Id*. at 990.)

At Bell's September 21, 2017 CPST appintment, Mr. Montassi referred Bell to therapy for talking about her trauma and processing traumatic events, as she was still experiencing nightmares that "relate directly to [her] trauma." (*Id*. at 938.)

At Bell's November 2, 2017 CPST appointment, Mr. Montassi gave Bell a dream notebook to record her dreams, since she was still experiencing nightmares. (*Id*. at 942.) He noted that her sleep medications made Bell "drowsy and appear to be under the influence." (*Id*.)

4

In November 2017, Bell resumed therapy through Connections, with the goals of maintaining abstinence and learning to identify and understand the triggers for her depression. (*Id.* at 958.)

At Bell's March 5, 2018 CPST appointment, she told Mr. Montassi her nightmares were "fewer and farther in-between." (*Id*. at 947.)

### 2. Physical Impairments

On November 18, 2016, Bell was referred to the Physical Medicine and Rehabilitation Clinic ("PMRC") for treatment of bilateral extremity pain in her thighs. (*Id.* at 222.) She reported she had recently been fired from her job at Subway because "[s]he could not tolerate the prolonged standing." (*Id.* at 223.) Nurse Practitioner Tyecia Stevens examined Bell and found "tenderness in bilateral thigh," and positive bilateral straight leg raising with "radicular symptoms." (*Id.* at 224.) All other findings were normal. (*Id.*) Nurse Stevens ordered an x-ray of Bell's lower spine, and prescribed Mobic and Zanaflex for her pain. (*Id.* at 225.)

The x-ray of Bell's spine, taken the same day, revealed "[g]rade 1/4 spondylolisthesis of L4 on L5, moderate L4-5 and mild L5-S1 disc space narrowing, mild endplate spurring of the lumbar vertebra and hypertrophic degenerative arthritis of the lower lumbar facet joints." (*Id.* at 248, 569.) An x-ray of her hips and pelvis showed "some irregularity . . . along the right inferior pubic ramus," but was otherwise normal. (*Id.* at 576.)

On January 20, 2017, Bell returned to Nurse Stevens at PMRC for a follow-up. (*Id.* at 216.) She reported that she continued to suffer from bilateral extremity pain in her thighs, had recently completed rehab, and sought a stronger non-narcotic pain medication. (*Id.*) Nurse Stevens' examination findings were unchanged, and she ordered physical therapy as well as adjusting Bell's medications. (*Id.* at 219.)

5

On February 8, 2017, Bell saw rheumatologist Raymond Hong for evaluation. (*Id.* at 566.) He did not believe her history or exam were consistent with inflammatory arthritis, but because she had thigh pain with hip range of motion, Dr. Hong ordered x-rays of both hips to assess for hip osteoarthritis. (*Id.* at 570.) Dr. Hong also prescribed gabapentin. (*Id.*)

On February 17, 2017, Bell returned to Nurse Stevens at PMRC, reporting that she had begun physical therapy, but neither therapy nor medication were helping at all. (*Id*. at 479.) Nurse Stevens prescribed gabapentin, Voltaren and Sanaflex, as well as continued physical therapy. (*Id.* at 483.)

On February 8, 2017, Bell began physical therapy to address "pain, stiffness and weakness to core and bilateral [lower extremities] dues to no specific injury."[4] (*Id.* at 375.) Her initial assessment showed "positive FABERS for pain B,"[5] pain with back bend, and a 46% limitation using the Oswestry Disability Index[6]. (*Id.*)

On March 8, 2017, physical therapist Paula Divincenzo noted that Bell had no change in symptoms and had a "poor response" to physical therapy. (*Id.* at 352.)

On March 17, 2017, Bell returned to Nurse Stevens at PMRC, reporting that the medications were not working, and physical therapy had provided "no relief." (*Id.* at 473-74.) The physical examination showed "tenderness in bilateral thigh," and positive bilateral straight leg raising with

---

[4]  Bell cites to a 25-page chunk of treatment records, which is not in compliance with the Court's Initial Order. (Doc. No. 4 at 3) (" In the 'Facts' section, the brief shall cite, by exact and specific transcript page number, the pages relating to these facts.")

[5]  The FABER Test stands for: Flexion, Abduction and External Rotation. These three movements combined result in a clinical pain provocation test to assist in diagnosis of pathologies at the hip, lumbar and sacroiliac region.   Martin RL, Sekiya JK. *The interrater reliability of 4 clinical tests used to assess individuals with musculoskeletal hip pain*. J Orthop Sports Phys Ther. 2008 Feb; 38(2): 71-7. Epub 2007 Sep 21.

[6]  This result indicates a "severe disability" where activities of daily living are affected.

"radicular symptoms." (*Id.* at 477.) All other findings were normal. (*Id.*) Nurse Stevens discontinued Volatern, which was causing rectal bleeding, and increased Bell's dosage of gabapentin. (*Id.* at 478.)

On March 28, 2017, an MRI of Bell's spine revealed multilevel degenerative changes, effecting L2-S1 vertebrae. (*Id.* at 468-69.) The most significant changes were at the L4-L5 level, where Bell had "prominent facet arthropathy, thickening of ligamentum flavum and diffuse disc bulge causing moderate narrowing of the spinal canal and bilateral neural foramina." (*Id.* at 469.)

On April 28, 2017, Bell returned to Nurse Stevens at PMRC, reporting that her symptoms were "still the same," and the medications provided "no relief." (*Id.* at 467.) Nurse Stevens noted that Bell had "failed conservative therapy." (*Id.* at 472.) She administered a Toradol injection, prescribed bilateral transforminal epidural steroid injections, discontinued Zanaflex and added Robaxin and Lyrica to Bell's medication regimen. (*Id.* at 472.)

Also on April 28, 2017, Nurse Stevens completed a medical source statement regarding Bell's physical impairments. (*Id.* at 52-53.) She opined that Bell had the following limitations to her residual functional capacity ("RFC"):

- Occasionally lift and or carry 15 pounds and frequently lift or carry less than 10 pounds;

- Stand or walk less than 15 minutes in an eight-hour workday;

- Sit no more than 30 minutes in an 8-hour workday;

- Rarely climb, balance, stoop, crouch, kneel, or crawl;

- Occasionally reach;

- Rarely push or pull;

7

- Alternate between sitting, standing, and walking at will; and

- Receive 2 or 3 additional rest breaks in an 8-hour workday.

(*Id*.)

On May 25, 2017, Bell received bilateral transforminal epidural steroid injections at MetroHealth. (*Id.* 748.)

On June 23, 2017, Bell returned to Nurse Stevens at PMRC, and reported "great improvement" following the injections. (*Id.* at 800.) She requested additional injections, and advised Nurse Stevens that she was unable to fill her Lyrica prescription due to cost. (*Id.*) Nurse Stevens gave her another Toradol injection and added Elavil to her medication regimen. (*Id.* at 806.)

On June 1, 2018, Nurse Stevens filled out an Evaluation Form regarding Bell's physical functioning. (*Id*. at 1015.) She opined Bell could stand or walk for ten minutes in an eight-hour work day, sit for twenty minutes in an eight-hour work day, lift less than ten pounds occasionally, not push or pull repetitively, occasionally bend, and never squat, crawl, or climb. (*Id*.) She noted Bell's condition was stable, but chronic, and surgical intervention was not anticipated. (*Id*.)

## C.    State Agency Reports

### 1.    Mental Impairments

Consultative examining psychologist Herschel Pickholtz, Ed.D., examined Bell at the request of the Division of Disability Determination on March 21, 2017. (*Id*. at 339-46.) He opined that Bell's estimated IQ, and capacity for attention and concentration were in the low-average range. (*Id*. at 346.) Her capacity to understand, remember and carry out instructions for simple or complex work activities were not impaired. (*Id*.) Her capacity to perform three or four step tasks suggested "a slight impairment at most." (*Id*.) Her ability to respond to supervisors and coworkers was not

impaired. (*Id.*) Her ability to handle work pressures in a work setting suggested "a slight impairment at most as long as she remains sober and continues to take her psychiatric medications." (*Id.*) However, he did not believe she would be capable of independently monitoring her benefits, should any be granted. (*Id.*)

State agency reviewing psychologist Jennifer Swain, Psy.D., reviewed Bell's file on March 21, 2017, and concluded that the evidence did not support a finding of any severe mental impairment. (*Id*. at 54-56.)

State agency reviewing psychologist Kristen Haskins, Psy.D, reviewed Bell's file on May 18, 20-17, and concurred that the evidence did not support a finding of any severe mental impairment. (*Id*. at 67-68.)

### 2. Physical Impairments

State agency physician William Bolz, M.D., reviewed Bell's file on February 20, 2017, and opined that Bell had the following limitations to her RFC:

- Occasionally lift and or carry 20 pounds and frequently lift or carry 10 pounds;

- Stand, walk, or sit about 6 hours in an eight-hour workday;

- Frequently climb ramps or stairs;

- Occasionally stoop or crawl; and

- Avoid concentrated exposure to noise and hazards.

(*Id*. at 57-59.)

On May 19, 2017, state agency reviewing physician Yeshwanth Bekal, M.D., reviewed Bell's file and concurred with the opinion of Dr. Bolz. (*Id*. at 70-71.)

**D.**     **Hearing Testimony**

During the July 12, 2018 hearing, Bell testified to the following:

•        She lives in Cleveland, with her daughter.  (*Id*. at 33.)

•        Her daughter doesn't work or go to school, but cares for two of her grandchildren at the shared apartment on weekends.  The children are six and five years old.  (*Id*. at 34.)

•        She attends AA meetings and church regularly.  (*Id*.)

•        At church, she helps with the children's lessons and snacks, helps with Bible studies, and helps decorate.  (*Id*. at 34-35.)

•        She is not clear about the status of her job training through Vocational Guidance Services ("VGS").  The cleaning job only lasted one week.  A coach worked with her on that job to evaluate her capabilities.  Now she is waiting for placement in a job where she can sit down.  (*Id*. at 35-36.)

•        Sobriety is "going great," although she still smokes marijuana a couple of times a week to help with her pain, "but it really is not helping . . . my pain at all."  (*Id*. at 36.)

•        She told VGS that she needs a job with no lifting, not much standing, and where she does not have to sit for a long period of time.  (*Id*.)

•        She is most comfortable lying on her back.  She spends her days watching movies while lying on the couch.  (*Id*. at 37.)

•        Her daughter does the laundry, cooking, and housekeeping.  (*Id*. at 38.)

•        She can get herself bathed and dressed, but "it takes me awhile." (*Id*.)

•        She sleeps downstairs because she has issues with walking.  She does have to go upstairs to shower and bathe.  (*Id*.)

•        She has used a cane for about a year, but "not all the time."  She did not bring it to the hearing.  (*Id*. at 39.)

•        Her medication helps her feel more comfortable around people, but without it "I don't feel like I'm normal when I'm around people."  (*Id*. at 40.)

- Loud noises trigger her PTSD. (*Id*. at 41.)

- She can lift and hold a gallon of milk, but not for 2-3 hours a day. (*Id*.)

- The VGS cleaning job was four hours a day, for five days. She completed all five days. She needed to sit two or three times each day. At the end of the week, she was feeling a lot worse, with pain in her legs and back. (*Id*. at 41-42.)

The ALJ identified the VE, and posed the following hypothetical question:

> Assume a hypothetical individual the same age, education and work experience as the claimant limited to light work. No ladders, ropes, and scaffolds. Frequent ramps and stairs. Occasional stoop, crawl. Avoid concentrated exposure to excess noise and unprotected heights. Can this hypothetical individual perform any jobs in the national economy?

(*Id*. at 43.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as wire worker, electronics worker, and electrical assembler. (*Id*.)

The ALJ then posed a second hypothetical question:

> This individual would have the same restrictions from the first hypothetical, but now it needs to change positions from sitting to standing and walking every 20 minutes resulting in being off task more than 20 percent of the workday. This person would be limited to lifting no more than five pounds occasionally. Would that individual be able to perform the jobs you just referenced or any other jobs?

(*Id*. at 44.)

The VE testified the hypothetical individual would not be able to perform any jobs. (*Id*.) He also testified that modifying the first hypothetical to add restrictions that the individual could only occasionally reach in all directions and should rarely push or pull would eliminate all jobs. (*Id*.)

### III.    STANDARD FOR DISABILITY

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). *See also Ealy v. Comm'r of*

*Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant has not engaged in substantial gainful activity since January 27, 2017, the application date.

2.      The claimant has the following severe impairments: disorder of the lumbar spine, migraines, and obesity.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except never climbing ladders, ropes, or scaffolds, frequently climbing ramps and stairs, occasionally stooping and crawling. She must avoid concentrated exposure to excess noise and unprotected heights.

5.      The claimant has no past relevant work.

6.      The claimant was born on April **, 1965, and was 51 years old, which is defined as an individual closely approaching advanced age, on the date when the application was filed.

7.      The claimant has at least a high school education and is able to communicate in English.

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since January 27, 2017, the date the application was filed.

(*Id.* at 17-24) (citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir.

2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the

14

Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.      First Assignment of Error: The Opinions of Plaintiff's Treating Nurse Practitioner

Bell asserts that the ALJ erred in giving "little weight" to the opinions of Nurse Stevens, and argues his evaluation of those opinions was insufficient to meet his obligations under the law. (Doc. No. 13 at 13.)  She asserts that the "evidence of record" that the ALJ found inconsistent with Nurse Stevens' opinion was "just one examination" that was "not accurately described." (*Id.* at 14.) She also argues that he erred by failing to acknowledge other "regulatory factors" such as Nurse

Stevens' expertise, and "cherry picked" the record, ignoring examination findings and treatment notes which supported her opinion, including her poor response to physical therapy and need for epidural steroid injections and Toradol injections. (*Id.* at 15-16.) Finally, she argues that he failed to build a logical bridge between the evidence and his decision. (*Id.* at 16.)

The Commissioner responds that the ALJ appropriately assessed Bell's limitations and discounted the weight given to Nurse Stevens' opinion based on substantial evidence, including records documenting multiple examinations and imaging results. (Doc. No. 15 at 14.)

Under Social Security Regulations, a nurse practitioner is not an "acceptable medical source" whose opinion is entitled to the type of "controlling weight" an "acceptable medical source" opinion enjoys. *See* 20 C.F.R §§ 416.902(a)(1) - (8), 416.927(a)(1), 416.927(f).[7] However, the regulations provide these sources' opinions still must be considered, using the same factors listed in 20 C.F.R. §416.927(c). The regulations further provide "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these source or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning." 20 C.F.R. §416.927(f)(1)-(2).

Social Security Ruling 06-03[8] further explains how opinion evidence from "other sources" should be treated. SSR 06-03p provides information from "other sources" (such as a chiropractor)

---

[7]     For claims filed prior to March 27, 2017. *See* 20 C.F.R. §§ 416.902(a)(7). Bell's claim was filed January 27, 2017.

[8]     The Court notes SSR 06-03p was rescinded on March 27, 2017. This rescission is effective for claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928298 at *1. Bell's claim was filed January 27, 2017.

is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939 at *2-3 (August 9, 2006). Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007); s*ee also Williams v. Colvin,* No. 5:15-cv-2185*,* 2017 WL 1074389 at *3 (N.D. Ohio March 22, 2017).

Nurse Stevens offered two opinions on Bell's functional capacity. On April 28, 2017, Nurse Stevens completed a medical source statement regarding Bell's physical impairments. (Tr. 52-53.) She opined that Bell could occasionally lift and or carry 15 pounds and frequently lift or carry less than 10 pounds; stand or walk less than 15 minutes in an 8-hour workday; sit no more than 30 minutes in an 8-hour workday; rarely climb, balance, stoop, crouch, kneel, or crawl; occasionally reach; rarely push or pull; alternate between sitting, standing, and walking at will; and would require two or three additional rest breaks in an 8-hour workday. (*Id*.) Thirteen months later, on June 1, 2018, Nurse Stevens filled out an evaluation form regarding Bell's physical functioning. (*Id*. at 1015.) She opined Bell could stand or walk for 10 minutes in an 8-hour work day, sit for 20 minutes in an 8-hour work day, lift less than 10 pounds occasionally, not push or pull repetitively, occasionally bend, and never squat, crawl, or climb. (*Id*.) She noted Bell's condition was stable, but chronic, and surgical intervention was not anticipated. (*Id*.)

In his decision, the ALJ addressed both these opinions, explaining, "[t]he undersigned gave little weight to these opinions, because they are not consistent with the evidence of record. Physical

exams and imaging show mild findings, which support much less restrictions." (*Id.* at 22.) He cites to a single page of the record in support of this statement: a section from the record of a June 23, 2017 examination by Nurse Stevens that reviews Bell's symptoms and notes largely normal examination findings, including normal sensation, motor strength and fine motor coordination in Bell's legs. (*Id.* at 805.) The abnormal findings included "[p]alpatory exam revealed tenderness in lumbosacral paraspinal bilaterally. . . . tenderness in bilateral thigh. . . . [and straight leg raise] was positive . . . bilaterally with radicular symptoms." (*Id.* at 805.) Nurse Stevens noted that Bell was "able to heel walk, toe walk and tandem gait without difficulty" but had a "[s]low limping gait." (*Id.*)

Bell contends that the fact that the ALJ cited one page of the record immediately after his explanation for giving Nurse Stevens' opinions little weight shows that he based this determination on only a single treatment record. However, elsewhere in his decision, the ALJ provided a more through analysis of the record, and, on review, the Court looks at the decision as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983) (To determine whether substantially evidence exists, "a reviewing court is to look at the evidence 'taken as a whole.'")

Here, the ALJ's discussion of the record evidence relating to Bell's physical impairments makes clear that the conflicting evidence which he weighed before reaching his determination comprised more than a single page of examination notes. For example, he references physical therapy notes from visits on February 2, 2017, showing Bell had good muscle strength and was able to walk independently, although slowly. (Tr. 21.) He summarizes the findings of x-rays taken in November 2016, and Bell's MRI results. (*Id.*) He notes that Bell received a Toradol injection in

18

June 2017, and observes that treatment notes indicate "her condition was improving" and her "physical exam was normal, with normal lumbar lordotic curvature, no scoliosis, no evidence of spasm, normal reflexes, sensation, coordination, and motor strength." (*Id.*) He also notes that a July 2017 examination "was negative for back pain, joint swelling, or neck pain." (*Id.*) Thus, the ALJ's decision explicitly references much of the "contradictory, objective medical evidence" that Bell asserts he overlooked. (Doc. No. 13 at 15.) The fact that he did not interpret this evidence in the same way Bell does is not grounds for reversal. *See, e.g., Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") Nor is it difficult to follow the logical bridge between the evidence he cited and the ALJ's conclusion that Nurse Stevens' opinions were contradicted by this evidence. The ALJ acted within his zone of choice, and the Court must affirm his determination regarding Nurse Stevens' opinions.

**B.     Second Assignment of Error: The Evaluation of Plaintiff's Mental Impairments.**

Bell next asserts that the ALJ erred by determining that Bell's mental impairments - depressive disorder, post-traumatic stress disorder and panic disorder - were not severe impairments. (Doc. No. 13 at 16.) She argues he "compounded the error" by failing to address these impairments in his RFC finding. (*Id.*) She points out that he gave "great weight" to the opinions of state agency reviewing psychologists who reviewed the record prior to Bell's therapy, but failed to discuss those treatment notes. (*Id.* at 18-19.)

The Commissioner responds that substantial evidence supports the ALJ's determination that Bell's mental impairments were not severe. (Doc. No. 15 at 7.) He argues that the evidence regarding the severity of these impairments is inconsistent, and the ALJ appropriately used clinical

findings, personal observations noted in exam records, and medical source opinions to resolve evidentiary conflicts. (*Id.* at 9.) While he acknowledges the ALJ did not cite the records from counseling that began in April 2017, he asserts that they provide additional support for the ALJ's decision. (*Id.* at 16-17.)

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment. *See* 20 C.F.R. §§ 404.1520(a) (40)(ii). To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 416.920(c). "An impairment . . . is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a). Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as standing, sitting, lifting, handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b) & 416.921(b).

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe." SSR 96 3p, 1996 WL 374181 at *1 (July 2, 1996). However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions

imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96 8p, 1996 WL 374184, at *5 (July 2, 1996). This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id.* "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id.*

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at step two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009). The Sixth Circuit has observed that where a claimant clears the hurdle at step two (i.e. an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is . . . legally irrelevant." *Anthony v. Astrue*, 266 F. App'x at 457.

Here, the ALJ considered evidence of Bell's mental impairments, and determined that they were not "severe" because "considered singly and in combination, [they] do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." (Tr. 18.) He cites evidence, taken from the Function Report completed by Bell, showing that she has no limitation in each of the four broad areas of mental functioning defined by the Social Security regulations. (*Id.*)

Bell places emphasis on the fact she completed this report in February 2017, prior to "the start of her mental health treatment." (Doc. No. 13 at 18.) The undersigned, however, understands functional capacity to be at its most limited when mental illness is untreated, and, thus, finds the ALJ's reliance on the fact that Bell's self-reports do not claim more than mild limitations at this time to be reasonable. The ALJ also gave "great weight" to the opinions of the state agency reviewers, who opined that Bell's mental impairments were not severe, and "some weight" to the opinion of consultative examiner Dr. Pickholtz, who opined that Bell had a "slight impairment from psychiatric symptoms."

Instead, Bell argues the ALJ should have found her mental impairments significantly limited her functioning because she received 14 months of treatment, documented in notes from her case manager, therapist and psychiatrist. (Doc. No. 13 at 19.) However, Bell did not point to any specific records from any of these providers which show severe mental impairment. She acknowledged that, in her hearing testimony, she told the ALJ medication controls the symptoms of her mental illness, allowing her to feel more comfortable around other people. (*Id.* at 18 n.7 *citing* Tr. 40.) Bell also acknowledged telling consultative examiner Dr. Pickholtz that her depressive episode occurred only about twice a week, and lasted about 15 minutes. (*Id. citing* Tr. 343.)

The record from Bell's therapy show that after three counseling sessions in April and June of 2017, Bell declined further counseling and asked to be assigned a case manager to help her appeal her SSI denial. (Tr. 837.) Her case manager, Damien Montassi, MSW, also provided some trauma counseling and encouraged her to re-start therapy. (*Id*. at 845.) When Bell resumed therapy in November 2017, her goals were to maintain her sobriety and identify triggers for her depression, which might lead to relapse. (*Id*. at 958-59.) Even at therapy sessions where Bell worked on the

goal of improving her functioning to increase her independence, she reported to her therapist that she was "staying busy watching her grandchildren and attending church," indicating that her activities of daily living were not significantly impaired.  (*Id.* at 971.)

While it is true that the ALJ did not discuss these treatment notes in his decision, he did consider evidence of Bell's mental impairments in his determination of RFC.  (*Id.* at 20-23.)  He evaluated the opinion of Mr. Montassi, expressed in a December 2017 letter, that Bell "has a long road to mental health recovery."  (*Id.* at 22.)  The ALJ gave this opinion "limited weight" because it conflicted with Bell's own assessment of her functioning, both in her Functional Assessment and in her testimony at the hearing.  (*Id.*)  It also failed to articulate any functional limitations resulting from her mental impairments.  The ALJ also noted that Bell had normal mental examination results, and evaluated the opinions of consultative examiner Dr. Pickholtz and the state agency reviewers, all of whom opined about Bell's mental impairments, as discussed *supra.* (*Id.* at 22.)

The ALJ's determination regarding Bell's mental impairments was supported by substantial evidence, and his findings are within his zone of discretion.  Therefore, these issues do not provide a basis for remand.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**


      *s/Jonathan D. Greenberg*
      Jonathan D. Greenberg
      United States Magistrate Judge

Date: February 5, 2020